Filed 11/17/25

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re C.L. et al., Persons Coming Under the Juvenile Court Law. | B345433, B345437, B346370 (Los Angeles County Super. Ct. No. 23CCJP00841A–D) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. WILLIAM M. et al., Defendants and Appellants. | |

APPEALS from orders of the Superior Court of Los Angeles County, Juan M. Valles, Juvenile Court Referee. Affirmed.

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant William M.

---

* Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of part II of the Discussion.

Christopher R. Booth, under appointment by the Court of Appeal, for Defendant and Appellant B.P.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

———————————————

B.P. (mother) and William M. (father) challenge orders of the juvenile dependency court related to their four children.

Mother argues the evidence was insufficient to support the juvenile court's finding that the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1900 et seq.) does not apply to these proceedings. First, mother contends that although the reports of the child welfare agency, the Los Angeles County Department of Children and Family Services (DCFS), informed the court that two of the children's extended paternal family members denied that the family had any "Native American heritage," DCFS's inquiry of those family members was inadequate because "the record does not indicate [DCFS] actually asked [them]."

Second, although DCFS informed the juvenile court that the parents, the maternal and paternal grandmothers, a maternal great uncle, a paternal cousin, and others reported that the children have no Native American ancestry, mother contends DCFS's inquiry was inadequate, and the juvenile court lacked sufficient evidence to determine whether the children are or may be Indian children, because the agency failed to interview a maternal uncle about ICWA. Following the usual principles of appellate review and the applicable standard of review, we find no error.

2

Father argues the juvenile court erred in denying his petition for a change of court order pursuant to Welfare and Institutions Code section 388.[1]  In the unpublished portion of this opinion we consider his argument and find no abuse of discretion.

**FACTUAL AND PROCEDURAL BACKGROUND**

*Initial Referral and Section 300 Petition*

In January 2023, DCFS responded to a referral alleging that the parents' domestic violence placed eight-year-old C.L., six-year-old D.M., and three-year-old H.M. at risk of harm.  Although mother had an active criminal protective order prohibiting father from contacting her, father had gone to the home mother shared with the children.  Father started drinking, cursed at mother, threatened to kill her, held her against the wall with his forearm pressed to her throat, and threw a liquor bottle at her, injuring her lip and her head.  The children were present during the altercation.

A police report indicated the incident was the third time the law enforcement agency had taken a report for domestic violence between the parents and there were 20 to 30 prior incidents that had gone unreported.  Despite the criminal protective order, which was issued in late 2022 and did not expire until late 2025, the parents had "tried to make it work."  Mother was pregnant with father's child.  She told a social worker that father was violent when he was intoxicated.  When he was drinking, father became a "different person."

Father denied assaulting mother and denied that he had been drinking.  He was already participating in a 52-week

---

[1]     All further statutory references are to the Welfare and Institutions Code.

3

domestic violence counseling program as part of his criminal probation.  He had perfect attendance in the program.

In May 2023, the juvenile court sustained a petition alleging the children were persons described by section 300, subdivision (b), based on father's violence against mother and mother's failure to protect the children.  At a subsequent disposition hearing, the court removed the children from father and allowed them to remain with mother.  The court ordered services for father.  Father was to participate in a full substance abuse program with aftercare, complete a 52-week certified domestic violence batterers' intervention program, submit to weekly drug and alcohol testing, participate in a 12-step program, complete parenting and anger management programs, and engage in individual counseling to address case issues.  The court ordered monitored visits for father.  Mother was to receive family maintenance services.

### Subsequent and Supplemental Petitions

In August 2023, father engaged in another violent incident. According to a police report, father and the maternal uncle had been at mother's home, watching a movie and drinking beer.  The maternal uncle had just arrived from Texas.  The two men argued and got into a physical altercation, which ended with father hitting the maternal uncle with his car.  The car then flipped over and crashed into a neighbor's property.  Following this incident, the juvenile court detained the children from mother and found visitation with father would be detrimental to the children.

The family's accounts of the incident were inconsistent. The maternal grandmother told police that father and the maternal uncle had been inside mother's home, drinking, when

4

they began to argue.  She later recanted this statement and claimed father had not been in the home.  She also said that when the maternal uncle arrived at the house he was possibly intoxicated and was not allowed to enter.  The maternal grandmother was not sure if father was intoxicated.  Mother told a social worker father came to the home despite the restraining order and " 'maybe he was drunk.' "  She denied that either man was inside the home.

Around two weeks after the incident, a DCFS social worker received a call from a person who identified himself as the maternal uncle.  He had learned about the content of the police report from the maternal grandmother.  He denied telling police officers "that he was in mother's home watching a movie with father and drinking beers."  The police had interviewed him while he was in the hospital and he claimed he was heavily medicated at the time.  As the maternal uncle described the incident to the social worker, he had "just arrived from Texas to join Christian Recovery Center in Long Beach."  He was visiting the family when father arrived at mother's home.  Although the maternal uncle and father argued outside the home, they resolved the dispute.  Father agreed to give the maternal uncle a ride to the recovery center. When the uncle was walking off the porch he was hit by a car.  He saw the car but not the driver.

A social worker later attempted to contact the maternal uncle for a further interview.  The maternal uncle did not answer at the telephone number the social worker called.  She was unable to leave a message because the voicemail was not set up.  The social worker sent the maternal uncle a text message but received no response.  The worker had been told that the maternal uncle was receiving inpatient rehabilitation services at

a facility in Long Beach.  The social worker searched for a telephone number for the program, "but reached a facility in [Florida]."  DCFS asked the maternal grandmother about contacting the maternal uncle.  She "confirmed the [maternal uncle] is still in his program, and stated he is unable to receive phone calls on his personal cellphone."

In October 2023, the juvenile court sustained section 342 and 387 petitions as to C.L., D.M., and H.M.  The court also sustained a petition finding the parents' infant, W.M. (born July 2023), to be a person described by section 300, subdivisions (a), (b), and (j).  At the disposition hearing, the court removed the children from both parents.  The court ordered DCFS to provide father with the same reunification services as previously ordered.  However, the court specified that the batterers' intervention program was to be in person.  The court continued to find that any visitation between father and the children would be detrimental.

***Reunification Period***

In the year that followed, father had no contact with DCFS.  The social workers' attempts to contact father were unsuccessful.  DCFS learned that in December 2023 and February 2024, police reports were generated documenting further domestic violence between the parents.  The December 2023 report stated that father had climbed into mother's home through an unlocked window.  Father took mother's phone, hit her, kicked her, and pulled her hair.  The February 2024 report indicated that father arrived at mother's home and appeared to be under the influence.  He became enraged upon seeing that mother was wearing makeup and was dressed to go out.  He ripped off mother's bra and fled only after mother said she was calling the police.

In October 2024, the juvenile court terminated the parents' reunification services and set a date for a permanency planning hearing. In November 2024, father met with DCFS social workers. He said he had avoided contact with DCFS because "he did not want his children to see him have an unstable lifestyle." He reported having no contact with the children.

Although the criminal protective order prohibiting father from having contact with mother remained in effect, one of the children saw the parents getting off a bus together in November 2024. A DCFS social worker also saw the parents together. The parents denied having any contact with one another.

### Father's Section 388 Petition and Permanency Planning

In March 2025, father filed a section 388 petition. Father asked the court to lift the detriment finding, permit him to have visits with the children, and reinstate his reunification services. In a declaration dated March 7, 2025, father declared that as of March 6, 2025, he had enrolled in an outpatient substance abuse program. He had submitted to a drug test on March 6 and expected to test regularly. He claimed he had been sober since October 2024. Father also provided paperwork documenting that he had completed online parenting and anger management courses on February 26, 2025. He described what he had learned in the classes. He also completed a 52-lesson online domestic violence program on February 26, 2025.

Father asserted he had been told the children cried and wanted to see him. He argued they would benefit from having a relationship with him. He wanted to learn more about the children and their interests, and he sought to "help motivate them and support them so they can be the best person they can

be in society." His paperwork reflected that he had attended four Alcoholics Anonymous meetings in November 2024.

DCFS reports indicated the children were thriving in their respective placements. C.L. was placed with a maternal great uncle who wished to adopt her. C.L. told a social worker she felt safe with the maternal great uncle and wanted to be adopted. The two youngest children were living with a paternal cousin and his wife, who wished to adopt them. H.M.'s verbal skills had developed. She said she felt safe, happy, and comfortable in the paternal cousin's home. W.M. was crawling and developing appropriately. He appeared bonded to the caregivers. D.M. was in a foster care placement. D.M. is autistic and non-verbal. However, he appeared comfortable and happy during DCFS visits to his caregiver's home. The caregiver reported D.M. was eating and sleeping well.

The juvenile court set father's section 388 petition for an evidentiary hearing.[2] DCFS filed a response recommending that the court deny father's requests. DCFS noted that although father represented that he was participating in a substance abuse program, he had failed to provide DCFS any proof of enrollment. He had not provided DCFS with any recent drug or alcohol test results. He also had not provided any updated proof of participation in a 12-step program. The domestic violence program he completed was only approximately 10 weeks and was online, rather than a 52-week in person program as the court had ordered. The online service provider through which father had completed the domestic violence, anger management, and

---

[2]     Mother also filed a section 388 petition. The court set the hearing to address both petitions. Mother does not challenge the juvenile court order denying her petition.

8

parenting courses, was not licensed in California. Father had no proof he had enrolled in or completed individual counseling. DCFS also had reports of father being seen with mother, in violation of the criminal protective order.

Following a hearing, the juvenile court denied father's section 388 petition. The court concluded father had made an insufficient showing of changed circumstances and failed to establish that the relief he requested would be in the children's best interests. The court conducted the permanency planning hearing and terminated parental rights as to C.L., H.M., and W.M. The court continued the hearing as to D.M. The parents timely appealed.

*ICWA Background*

The March 2023 detention report indicated that in February 2023, mother, the maternal grandmother, and father "stated" the family had no Native American ancestry. A DCFS social worker also inquired of the initial child abuse reporter, a police officer.

Mother and father subsequently filed ICWA-020 forms. The form asked whether the parent is or may be a member of, or eligible for membership in, a federally recognized Indian tribe; whether the children are or may be members of, or eligible for membership in, a federally recognized Indian tribe; whether one of the responding parent's parents, grandparents, or other lineal ancestors is or was a member of a federally recognized Indian tribe; whether the parent or the children are residents of or are domiciled on a reservation, rancheria, Alaska Native village, or other tribal trust land; whether the children are or have been wards of a tribal court; and whether the parent or the children possess an Indian identification card indicating membership or

9

citizenship in an Indian tribe.  Both parents checked the box on their respective forms stating "none of the above apply."

At the March 2023 detention hearing, the parents were present without any other family members.  The juvenile court reviewed the ICWA-020 forms on the record and asked the parents each to confirm their written statements that they had no Native American ancestry.  The juvenile court found it had no reason to know the children were Indian children.  However, the court ordered DCFS to "speak with maternal relatives and paternal relatives . . . and learn if there's any Indian ancestry and reduce their findings into writing in the next report."

The jurisdiction and disposition report informed the court of the parents' and maternal grandmother's February 2023 denials of Native American ancestry, and further reported that in April and May 2023, the parents and the maternal grandmother again denied having any Native American ancestry in their families.  Father told a social worker he was raised by both of his parents.  The paternal grandfather died when father was 15 years old.  Father was an only child, but he had stepsiblings.  Mother told a social worker she is the middle child of seven siblings, two of whom are deceased.  The maternal grandmother was her primary caregiver when mother was a child.

In September 2023, a DCFS social worker again attempted to interview the parents about the children's potential Indian status.  A report indicated "mother stated she has no knowledge of anyone in her family being a member of, or being enrolled with, any Native American Indian tribe.  She was unable to identify a tribe of affiliation and advised there are no other family members who could provide further information regarding the matter."  The social worker was unable to reach father.

10

As the case continued, reports noted the existence of, and DCFS's eventual contact with, extended family members, including the paternal grandmother, the maternal uncle with whom father had an altercation in August 2023, the maternal great uncle who was C.L.'s caregiver, and the paternal first cousin who, along with his wife, was H.M. and W.M.'s caregiver.

Only one report provided a narrative description of DCFS's interview with an extended family member about whether the children are or may be Indian children. An October 2023 last minute information report informed the court that the maternal grandmother "was also asked about the family's Native American Indian ancestry." The report quoted her response: " 'We don't have any Native American Indian heritage, and none of my family members are enrolled with a tribe. I don't have any family members who can provide any[ ]more information about this.' "

However, an April 2024 status report informed the court: "During this reporting period, the paternal grandmother, [F.M.], continues to report no known Native American ancestry. [¶] During this reporting period, the paternal cousin, [S.M.], continues to report no known Native American ancestry. [¶] During this reporting period, the paternal [*sic*] great uncle, [E.I.], continues to report no known Native American ancestry."[3]

A January 2025 section 366.26 report informed the court that in December 2024, a social worker "requested an update regarding ICWA" from the parents, the maternal grandmother, the paternal cousin's wife, and the maternal great uncle. Father did not respond to the social worker's attempts to contact him.

---

[3] Although the report referred to a paternal great uncle, it identified the relative by name. Other reports indicate this was the maternal great uncle.

11

Every other individual "reported 'No,' as to having any Native American ancestry in the family."  In January 2025, father also filed another ICWA-020 form as to W.M., stating none of the listed indicia of possible membership, or eligibility for membership, in an Indian tribe applied.

At the January 2025 permanency planning hearing, the juvenile court found ICWA did not apply.

## DISCUSSION

### I.    The Juvenile Court Did Not Err in Finding ICWA Does Not Apply

Mother contends there was insufficient evidence for the juvenile court to find ICWA does not apply to the proceedings because DCFS failed to make an adequate inquiry of the children's extended family members.  We find no error.

#### A.    Duty of inquiry

"Section 224.2 codifies and expands on ICWA's duty of inquiry to determine whether a child is an Indian child."[4]  (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1131, fn. omitted (*Dezi C.*).)  As relevant here, an Indian child is "[a]ny unmarried person who is under 18 years of age and who is either of the following: [¶] (A) A member or citizen of an Indian tribe.  [¶] (B) Eligible for membership or citizenship in an Indian tribe and is a biological child of a member or citizen of an Indian tribe."  (§ 224.1, subd. (b)(1).)

---

[4]    Section 224 et seq., is the California Indian Child Welfare Act.  (§ 224, subd. (c).)  The Act was amended during the pendency of the underlying proceedings.  (Stats. 2024, ch. 656, § 2, eff. Sept. 27, 2024.)  We refer to the current version of the statute.

12

Under section 224.2, subdivision (a), the juvenile court and the child welfare agency have an "affirmative and continuing duty" to inquire whether a child is or may be an Indian child. Section 224.2, subdivision (b)(1), mandates that when first contacted regarding a child, the agency must inquire whether the child is or may be an Indian child by asking a nonexclusive group that includes the party reporting abuse or neglect, the child, and the child's family, including extended family members. The term "extended family member" "has the same meaning as defined by the law or custom of the Indian child's tribe or, in the absence of such law or custom, shall be a person who has reached 18 years of age and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (§ 224.1, subd. (c)(1).) Following amendments effective September 2024, section 224.2, subdivision (b)(1), now specifies that "[a]t the first contact with the child and each family member, including extended family members, the county welfare department . . . has a duty to inquire whether that child is or may be an Indian child."

The inquiry duties continue if the child comes into the temporary or protective custody of the child welfare agency. Under section 224.2, subdivision (b)(2), the child welfare agency again has a duty to inquire whether the child is an Indian child. "Inquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (*Ibid*.)

13

Under section 224.2, subdivision (i)(2), if "the court makes a finding that proper and adequate further inquiry and due diligence as required in this section have been conducted and there is no reason to know whether the child is an Indian child, the court may make a finding that [ICWA] . . . does not apply to the proceedings, subject to reversal based on sufficiency of the evidence."

Although the statute does not specify what information must be included in the agency's record of its inquiry, California Rules of Court, rule 5.481(a)(5) provides the following guidance:[5] "The petitioner [here, the child welfare agency] must on an ongoing basis include in its filings a detailed description of all inquiries, and further inquiries it has undertaken, and all information received pertaining to the child's Indian status, as well as evidence of how and when this information was provided to the relevant tribes. Whenever new information is received, that information must be expeditiously provided to the tribes." (See *Dezi C.*, *supra*, 16 Cal.5th at p. 1131, fn. 5 [rules adopted by the Judicial Council are entitled to deference].)

" 'On a well-developed record, the court has relatively broad discretion to determine whether the agency's inquiry was proper, adequate, and duly diligent on the specific facts of the case. However, the less developed the record, the more limited that discretion necessarily becomes.' " (*In re Kenneth D.* (2024) 16 Cal.5th 1087, 1101–1102 (*Kenneth D.*).)

**B. Standard of review**

In *In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 1004–1005, disapproved on another ground in *Dezi C.*, a panel of this court

---

[5] All further rule references are to the California Rules of Court.

14

concluded that a juvenile court's finding that there is no reason to know a child is an Indian child is reviewed for substantial evidence. However, the court reasoned that the determination of whether the child welfare agency has engaged in a "proper and adequate further inquiry and due diligence as required" under section 224.2 is reviewed for an abuse of discretion. (§ 224.2, subd. (i)(2).) While it did not prescribe the proper standard of review, the California Supreme Court noted in *Dezi C.* "that the juvenile court's fact-specific determination that an inquiry is adequate, proper, and duly diligent is 'a quintessentially discretionary function' [quoting *Ezequiel G.*] subject to a deferential standard of review." (*Dezi C., supra,* 16 Cal.5th at p. 1141.)

### C. The juvenile court did not abuse its discretion in finding DCFS's inquiry of extended family members adequate

#### i. Paternal extended family members

Mother contends DCFS's inquiry of the children's paternal extended family members was inadequate because although DCFS "repeatedly reported" the paternal grandmother and paternal cousin "denied having Native American heritage," "the record does not indicate [DCFS] actually asked [them]." Mother does not provide any further explanation of this argument. We can only understand her to suggest that because the DCFS reports did not expressly state that a social worker asked these paternal relatives whether the family had any Native American ancestry, the court should not have credited what were obviously their responses to that question.

15

We reject mother's argument. When a report indicates that a child's relative has denied having Native American ancestry, it is reasonable for the juvenile court to infer that the denial was in response to a social worker's question. Indeed, it is difficult to discern under what circumstances a person would "[deny] having Native American heritage" unless DCFS had first asked whether the person had any Native American heritage. There is no indication in the record that DCFS had an alternative source of such information here.

Rule 5.481(a)(5) requires the child welfare agency to provide the court a "detailed description of all inquiries." Yet, nothing in the statute, the court rules, or relevant caselaw suggests that this reporting and documentation duty requires the child welfare agency to report verbatim a social worker's *questions* to extended family members. The failure to inform the juvenile court that a social worker asked specific questions does not invalidate the portions of the social worker's report informing the court of the *answers* to those questions. Nor must this court or the juvenile court assume that a social worker did not ask particular questions solely because the worker's report informs the court of the answers without also expressly documenting the questions.

To the extent mother contends the juvenile court should not have credited the reports of the paternal family members' denials of Native American ancestry because there was insufficient detail about the ICWA inquiry process, we reject the contention as a basis for reversal because it disregards the standard of review. As the *Dezi C.* court held, the determination of whether the agency's inquiry was adequate and duly diligent is quintessentially discretionary. Likewise, on appeal, we defer to

16

the juvenile court's credibility findings.  (See *Kenneth D.*, *supra,* 16 Cal.5th at pp. 1105–1106 [whether paternal grandmother's denial of native ancestry should be credited was for juvenile court to determine in the first instance].)  We also draw all inferences in favor of the juvenile court's orders and " ' "review the record in the light most favorable to the court's determinations." ' "[6]  (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

These fundamental precepts of appellate review remain applicable in ICWA inquiry cases.  Applying a deferential standard of review, as we must, we conclude the evidence supported the juvenile court's discretionary determination that DCFS conducted an adequate and duly diligent inquiry of the

---

[6]  We note that the reports DCFS submits to the juvenile court are not a log of every contact the agency has related to the case.  Detailed records of contacts are often maintained but only excerpted, summarized, or submitted to the court when relevant or requested.  For example, here, a last minute information report indicated the investigating social worker was unable to interview the paternal grandmother because she spoke only Spanish.  The social worker thus referred to "CWS/CMS," which documented another social worker's earlier contact with the paternal grandmother.  The investigating social worker then quoted that CWS/CMS entry in the report to the court.  (See, e.g., *In re D.N.* (2020) 56 Cal.App.5th 741, 750–751 [DCFS produced a " 'delivered service log' that listed 'All contacts, Services & Visits' offered by the agency in connection with [the] case"].)  While the juvenile court has the discretion to order DCFS to produce more detail to support a conclusory or summary statement in a report, the court may also reasonably conclude that a DCFS report's summary statement conveying what a person said reflects investigation, contacts, or communications that have occurred and are documented elsewhere.

17

reasonably available paternal family members mother has identified.

### ii.     Maternal uncle

Mother additionally argues the juvenile court erred in finding DCFS's inquiry adequate because the record does not reflect that the agency asked the maternal uncle whether the children are, or may be, Indian children.  We again disagree.

The *Dezi C.* court set forth several principles that guide our analysis.  In that case, the parties agreed DCFS's inquiry into the child's possible Indian status was inadequate, thus the court did not squarely address what an "adequate" and "duly diligent" inquiry entails.  However, in describing the underlying policy reasons for the statute's requirement that inquiry be made of extended family members, the court explained: "[A]s a result of forced assimilation policies, 'younger generations lack[ ] knowledge of their Native American ancestry which may only be reclaimed by conducting [a] proper ICWA inquiry with extended family members and others more knowledgeable.'  [Citation.] Recognizing that parents may not be the best source of information about a child's Indian ancestry, the Legislature expressly mandated that, from the outset, child protective agencies expand their investigation of a child's possible Indian status beyond the child's parents."  (*Dezi C.*, *supra*, 16 Cal.5th at p. 1139.)

Similarly, in explaining why parents may not have knowledge of their Native American heritage, the court again quoted amici curiae who emphasized the potential loss of information at a generational level: " '[G]enerations who lived through trauma at the hands of state actors pass a lack of self-identification as Native American to younger generations, leaving

18

only the older family members or extended family members with knowledge of' Indian ancestry.  [Citation.]  Parents may simply be estranged from, or have an unfavorable relationship with, extended family." (*Dezi C.*, *supra*, 16 Cal.5th at p. 1146.)

The *Dezi C.* court also rejected the appellate court's concern that automatic reversal when the inquiry was inadequate "would result in an 'endless feedback loop of remand, appeal, and remand' because the statutory duty of inquiry 'creates an open-ended universe of stones' . . . ." (*Dezi C.*, *supra*, 16 Cal.5th at p. 1140.)  The *Dezi C.* court responded: "[O]ur conclusion does not require reversal in all cases in which every possible extended family member has not been asked about the child's Indian ancestry.  As mother herself concedes, section 224.2 'does not require the agency to "find" unknown relatives and others who have an interest in the child, merely to make reasonable inquiries.  The operative concept is those people who are reasonably available to help the agency with its investigation into whether the child has any potential Indian ancestry should be asked.' " (*Ibid.*)

The *Dezi C.* court further explained that "[i]f, upon review, a juvenile court's findings that an inquiry was adequate and proper and ICWA does not apply are found to be supported by sufficient evidence and record documentation as required by California law (rule 5.481(a)(5)), there is no error and conditional reversal would not be warranted even if the agency did not inquire of everyone who has an interest in the child.  On the other hand, if the inquiry is inadequate, conditional reversal is required so the agency can cure the error and thereby safeguard the rights of tribes, parents, and the child." (*Dezi C.*, *supra*, 16 Cal.5th at p. 1141.)

19

Applying these overarching principles here, we conclude that sufficient evidence and record documentation supported the juvenile court's determination that DCFS's inquiry was adequate and proper and ICWA does not apply, even though the agency did not appear to ask the maternal uncle if the children are or may be Indian children. As an initial matter, the record does not clearly demonstrate that the maternal uncle was "reasonably available to help the agency with its investigation." (*Dezi C.*, *supra*, 16 Cal.5th at p. 1140.) The DCFS reports indicated the maternal uncle had been in Texas until the incident with father at mother's home; before the incident, the maternal grandmother had not seen the maternal uncle "for a couple of years"; he was possibly intoxicated during that incident and was in California specifically to check into a rehabilitation facility; and he contacted DCFS unexpectedly to recant the portions of his statement to police that were unfavorable to mother. A social worker was subsequently unable to reach him for a further interview.

However, even if the maternal uncle was available, we determine that, under the circumstances of this case, there was nonetheless substantial evidence supporting the juvenile court's implied and express findings. (*In re C.R.* (2025) 112 Cal.App.5th 793, 802 (*C.R.*) [juvenile court could reasonably find inquiry adequate where maternal grandmother was interviewed in a prior case and even though DCFS did not interview maternal aunt or maternal cousin about potential Native American ancestry]; but see *In re Claudia R.* (2025) 115 Cal.App.5th 76, 81 [finding DCFS inquiry inadequate where agency did not interview living and potentially available grandfathers and other relatives; concluding court may not find inquiry adequate if

20

agency did not interview all reasonably available extended family members].)

When first contacted about the family, DCFS social workers inquired of the individual reporting of the alleged abuse or neglect (a law enforcement officer), the parents, and the then available extended family member, the maternal grandmother.

Addressing the realities of generational loss of information that may have prevented the parents from having accurate information about their potential Native American ancestry, DCFS then made inquiries of all available extended family members in the older generations, namely the paternal grandmother, the maternal great uncle, and in further interviews with the maternal grandmother.  The maternal grandmother told a social worker there was no one else in the family who might possess additional information about the children's potential Indian status.  In addition to the paternal grandmother, DCFS made inquiries of a paternal cousin and the cousin's wife.[7]

Mother does not contend that, besides the maternal uncle, there were other relatives or avenues of inquiry the juvenile court should have required DCFS to pursue.  Mother also does not suggest that interviewing the maternal uncle could potentially have filled a gap in the information DCFS already had.  The court could reasonably consider the responses of mother, the maternal grandmother, and the maternal great uncle, as well as

---

[7]    Although the paternal cousin's wife is not an "extended family member," she and the paternal cousin are H.M. and W.M.'s caregivers, and she therefore is a person with "an interest in the [children]." (§ 224.2, subd. (b)(2).)  DCFS also asked a family preservation worker who provided services to the family about the children's potential Indian status.  The worker was not aware of the children having any Native American ancestry.

21

the absence of any indication the maternal uncle would have more information than his own mother (the maternal grandmother) as to whether the children are or may be Indian children.  (See *Dezi C.*, *supra*, 16 Cal.5th at p. 1169 (dis. opn. of Groban, J., joined by three justices [focus of court's analysis should be on whether the inquiry has resulted in reliable information about child's possible tribal affiliation, not the number of individuals interviewed].)

Mindful of the standard of review, we conclude the juvenile court did not abuse its discretion in impliedly finding DCFS's inquiry was adequate, and substantial evidence supported the court's finding that ICWA did not apply.  (*C.R.*, *supra*, 112 Cal.App.5th at p. 802.)

[[Begin nonpublished portion.]]

## II.  The Juvenile Court Did Not Abuse its Discretion in Denying Father's Section 388 Petition

Father contends the juvenile court erred in denying his section 388 petition.  We find no abuse of discretion.

Section 388 allows a parent to ask the juvenile court to "change, modify, or set aside any order of court previously made" by filing a verified petition identifying changed circumstances or new evidence that warrants the change of court order.  (*Id.*, subd. (a)(1).)  The parent bears the burden to "show by a preponderance of the evidence that there is new evidence or that there are changed circumstances that make" the requested change in the child's best interest.  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).)

Once the juvenile court has terminated reunification services, the focus of dependency proceedings shifts to the child's

22

need for permanency and stability. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) "[T]he parents' interest in the care, custody and companionship of the child are no longer paramount." (*Stephanie M.*, *supra*, 7 Cal.4th at p. 317.) "A court entertaining a section 388 petition at this stage in the proceedings 'must recognize this shift of focus in determining the ultimate question before it, that is, the best interest of the child.' [Citation.]" (*In re N.F.* (2021) 68 Cal.App.5th 112, 121 (*N.F.*).)

"In determining whether the petitioning party has carried his or her burden, 'the court may consider the entire factual and procedural history of the case.' [Citation.] 'Whether the juvenile court should modify a previously made order rests within its discretion, and its determination may not be disturbed unless there has been a clear abuse of discretion.' [Citation.]" (*N.F.*, *supra*, 68 Cal.App.5th at p. 120.)

Here, the evidence amply supported the juvenile court's finding that father failed to show there were changed circumstances or that reinstating reunification services, including visitation, would be in the children's best interest. There was evidence that father abused alcohol, and that his use of alcohol was linked to his violent behavior in the presence of the children. Although mother denied that father was an alcoholic, she told DCFS more than once that when father was intoxicated, he was "a different person," was violent, and "made stupid choices." The maternal grandmother likewise reported that father had "a problem" when he drank alcohol, but that when he was sober, "he is good." In the reported violent incidents, including the altercation with the maternal uncle, there was evidence that father had been drinking. Yet, father had enrolled in a substance abuse program only one day before he filed his

23

section 388 petition.  He did not corroborate his assertion that he had been sober for five months with any drug or alcohol test results.  He submitted proof of attendance at only four sessions of an Alcoholics Anonymous group.  On this basis alone, the juvenile court acted within its discretion in determining father had not established changed circumstances.

"The change in circumstances supporting a section 388 petition must be material.  [Citations.]  In the context of a substance abuse problem that has repeatedly resisted treatment in the past, a showing of materially changed circumstances requires more than a relatively brief period of sobriety or participation in yet another program." (*N.F.*, *supra*, 68 Cal.App.5th at pp. 120–121.)  Father's failure to address this significant aspect of the conduct that led to the children's removal was a reasonable basis for the juvenile court to determine father failed to show changed circumstances.  (See *In re Cliffton B.* (2000) 81 Cal.App.4th 415, 423 [seven months of sobriety did not show changed circumstances where father had a long history of drug use and relapse].)

The juvenile court also reasonably concluded father failed to establish that reinstating reunification services would be in the children's best interests.  Since the court had terminated reunification services, the focus of the proceedings was necessarily on providing the children with permanence and stability.  Father absented himself from the proceedings for over a year.  He proffered no evidence indicating that, during that time, he attempted to maintain, or develop, his relationship with the children, either by pursuing contact in an allowed form, or by engaging in efforts to show that visitation would no longer be detrimental.  He had not addressed his abuse of alcohol through

24

treatment and had no evidence to support his claims of sobriety. In the meantime, the children thrived with their respective caregivers. C.L. wanted the maternal great uncle to adopt her. H.M. and W.M. were bonded to their caregivers, the paternal cousin and his wife. Although a prospective adoptive parent had not yet been identified for D.M., he was doing well with his caregiver, who had cared for his needs as an autistic, non-verbal child.

In his petition, father asserted he had gained stability and wanted to learn about the children's interests and support them. This fell short of demonstrating it would be in the children's best interest to upend the permanence and stability they would gain in alternative permanent plans, to provide father an additional opportunity to attempt to build a relationship with them. (*In re J.C.* (2014) 226 Cal.App.4th 503, 527 [after termination of reunification services the minor's "best interests are not to further delay permanency and stability in favor of rewarding Mother for her hard work and efforts to reunify"].) The juvenile court did not abuse its discretion in denying father's section 388 petition.

[[End nonpublished portion.]]

25

## DISPOSITION

The juvenile court orders are affirmed.

**CERTIFIED FOR PARTIAL PUBLICATION**


ADAMS, J.


We concur:


EDMON, P. J.


HANASONO, J.